**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
-------------------------------------------------------x

| | |
|---|---|
| **JOHN DOE,** | Case No. |
| **Plaintiff,** | |
| **v.** | |
| **UNIVERSITY OF MASSACHUSETTS AT AMHERST, KUMBLE R. SUBBASWAMY, in his official capacity as Chancellor, WILLIAM D. BRADY, in his official capacity as Vice Chancellor, Chief Human Resources Officer & Interim Title IX Coordinator, and PATRICIA CARDOSO-ERASE, in her official capacity as Associate Dean of Students for Conduct and Student Compliance,** | **COMPLAINT** |
| **Defendant.** | **JURY TRIAL DEMANDED** |

-------------------------------------------------------x

**PLAINTIFF JOHN DOE** ("John Doe," a pseudonym),[1] by his attorneys Nesenoff & Miltenberg LLP, as and for his Complaint against Defendants UNIVERSITY OF MASSACHUSETTS AT AMHERST, KUMBLE R. SUBBASWAMY, in his official capacity as Chancellor, WILLIAM D. BRADY, in his official capacity as Vice Chancellor, Chief Human Resources Officer & Interim Title IX Coordinator, PATRICIA CARDOSO-ERASE, in her official capacity as

---

[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym.

Associate Dean of Students for Student Conduct and Compliance, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     This constitutional due process and Title IX discrimination suit for injunctive and monetary relief is brought on behalf of John Doe, who has been suspended from Defendant University of Massachusetts at Amherst ("UMass Amherst") for alleged sexual misconduct that he did not commit after a process that was not due process and that was not in compliance with the UMass Amherst Student Code.

2.     John Doe was a sophomore student at UMass Amherst in January 2020 when he was informed that he was the subject of a sexual misconduct disciplinary proceeding with regard to an incident that allegedly occurred in October 2018 when he was a freshman and about which the Complainant Jane Doe had filed with UMass Amherst a complaint in November 2019 – more than one year after the alleged incident, contrary to the Student Code requirement that such university complaints be brought within one year of the alleged incident.  In October 2018, Complainant Jane Doe had snapchatted John Doe to come to his room and did go to his room, where she engaged in sexual behavior that she claimed over a year later was non-consensual due to her incapacitation from intoxication.

3.     After a perfunctory investigation, John Doe was notified, in March 2020, of a "hearing" to be held in the case before five unidentified individuals, but it was not until April 22, 2020, that John Doe received an e-mail informing him the hearing would be held on April 24, 2020, two days away.  It was a "hearing" by ambush.  John Doe still had not been given access to the investigation filed and was not allowed such access until April 23, 2020, one day before the hearing, to see the investigation file, and even then, he was only allowed to see it for one hour and could not make copies of any of the documents in the file.  On April 24, 2020, the "hearing" was held at which neither John Doe nor Complainant Jane Doe were asked any questions.  The hearing questions were to two non-party witnesses asking how drunk Complainant Jane Doe was and what were Complainant Jane Doe's intentions in going to John Doe's room the night in question.

4.     On May 22, 2020, John Doe received the "outcome letter" from Associate Dean of Students for Student Conduct and Compliance Patricia Cardoso-Erase.  John Doe was found responsible for sexual misconduct in violation of the UMass Amherst Student Code.  The outcome letter only stated that conclusion and did not state any findings of fact or provide any explanation in support.  John Doe was sanctioned as follows: (1) immediate two-year suspension through May 31, 2022; (2) restriction from entering or residing in all University-approved housing; (3) re-entry assessment meeting to determine whether or not the University will

support the readmission application; (4) counseling with a licensed, off-campus health professional; (5) no contact directive with the complainant Jane Doe through May 31, 2025; and (6) follow-up meeting with a Student Conduct and Community Standards Office staff member during the first semester reenrolled at the university.

5.      John Doe filed with the university an appeal of the sanction, citing numerous procedural errors.  The appeal was denied.  This action has therefore been brought to rectify the constitutional due process violations and Title IX discriminatory actions.

## THE PARTIES

6.      John Doe is a natural person who is a resident of Long Island, New York.  Until the disciplinary proceeding brought as a result of complainant's belated complaint, John Doe had an unblemished disciplinary record at UMass Amherst.

7.      UMass Amherst is a public research and land-grant university located in Amherst, Massachusetts.  It is the flagship campus of the University of Massachusetts system. UMass Amherst has an annual enrollment of approximately 1,300 faculty members and more than 30,000 students. The university offers academic degrees in 109 undergraduate, 77 master's and 48 doctoral programs.  According to its audited financial reports, UMass Amherst had in $6,688,000 in federal appropriations in 2018 and $7,004,000 in federal

appropriations in 2019 and $81,590,000 in non-operating federal grants in 2018 and $84,454,000 in non-operating federal grants in 2019.

8.      Kumble R. Subbaaswamy, in his official capacity, is the Chancellor of UMass Amherst and has been July 1, 2012.  His university address is Office of the Chancellor, UMass Amherst, 374 Whitmore Building, 181 Presidents Drive, Amherst, Massachusetts 01003.

9.      William D. Brady, in his official capacity, is the Vice Chancellor  as Chief Human Resources Officer & Interim Title IX Coordinator at UMass Amherst. His   university   address   is   Human   Resources,   330   Whitmore Administration Building, 181 Presidents Drive Amherst, Massachusetts 01003.

10.     Patricia Cardoso-Erase, in her official capacity, is the Associate Dean of Students for Student Conduct and Compliance at UMass Amherst.  Her university address is Dean of Students Office, 227 Whitmore Administration Building, 181 Presidents Drive, Amherst, Massachusetts 01003.

## JURISDICTION AND VENUE

11.     This Court has federal question and jurisdiction pursuant to 28 U.S.C. § 1331 because the constitutional due process and Title IX claims herein arise under federal law and has federal civil rights under 28 U.S.C. § 1343 because the constitutional due process and Title IX claims herein arise under federal law civil rights statutes.

12.     This Court has personal jurisdiction over each of Defendants on the grounds that each Defendant is conducting business within the State of Massachusetts and is a resident of the State of Massachusetts and that Defendants' actions that are the subject of this action took place in the District of Massachusetts.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Federal Statutes and Regulations Forbid Gender Discrimination And Retaliation and Require Prompt and Equitable Disciplinary Proceedings.

14.     Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

15.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

16.     Umass Amherst is a recipient of federal funds and is therefore bound by Title IX and its regulations.

17.     As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from discrimination based on gender. A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

18.     Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational institutions to maintain and disclose campus crime statistics and security information. 20 U.S.C. § 1092(f).

19.     Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(i)(aa).

20.     The U.S. Department of Education's regulations implementing Title IX require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

21.     Regulations implementing the Clery Act require that campus Title IX proceedings:

      a.     "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result"

      b.     be conducted by trained officials

c.      "be completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay"

d.      be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused"

e.      include "timely notice of meetings at which the accuser or accused, or both, may be present"

f.      give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings"

g.      be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"

h.      include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions."

34 C.F.R. § 668.46(k). What happened in this case was not transparent to the accused.

**B.      OCR's 2001 Guidance Affirms the Requirement that Disciplinary Proceedings Be Prompt and Impartial.**

22.      The Department of Education's Office for Civil Rights ("OCR") is the federal agency in charge of enforcing Title IX compliance.

23.      In 2001, after a public notice and comment period, OCR issued a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

24.     OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."

25.     The 2001 Guidance further stated that "[a]ccording due process to both parties involved, will lead to sound and supportable decisions" and that the "due process" requirement applies to both public and private colleges and universities.

**C.      Starting in 2011, the Federal Government Pressures Educational Institutions to Provide More Protection to Students Alleging Sexual Assault, Focusing on Protection of Women.**

26.     Starting in 2011, the federal government, including OCR, began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on college campuses.

27.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when UMass Amherst's disciplinary procedures were put in place and the alleged sexual assault

occurred in this case.  Before the 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter.  The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

28.    Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations.  See 5 U.S.C. § 553. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which sexual harassment was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

29.    The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made

clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women;" it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women," it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited) and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

30.     The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment. For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks

"schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

31.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample.  Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," Washington Examiner, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

32.     Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against women.  Rape and Sexual Assault Victimization among College Age Females, 1995-2013 (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

33.     The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves.  The "April

2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault.  Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."  The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures.  Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

34.    On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers  on  Title  IX and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/ list/ocr/docs/qa-201404-title-ix.pdf.  The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the

ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

35.    Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rule-making, and both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

36.    In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "improperly used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, in violation of Title IX." (Emphasis in original.) The OCR letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy,"

which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf. Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

37.   The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants.  Almost all complainants are females and almost all respondents are males.  A study by United Educators showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.UploadedFiles/Confronting%20Campus%20Sexual%20Assault.pdf.

38.   While the April 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation, similar and timely access to any information that will be used at the hearing and adequately trained fact-finders and decision makers, the April 2011 Dear Colleague

Letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent and due process.

39.     Among other things, the April 2011 Dear Colleague Letter defined sexual harassment broadly as "unwelcome conduct of a sexual nature," conflating cases based on conduct with cases based on speech; stated that "mediation is not appropriate even on a voluntary basis" in cases involving alleged sexual assault; directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant"; directed schools to take interim steps to protect complainants and "minimize the burden on the complainant"; "strongly discourage[d]" schools from allowing cross-examination of parties; and urged schools to focus on victim advocacy.

40.     Even though the April 2011 Dear Colleague Letter purported to be a "guidance" document and did not go through rule-making procedures, OCR framed many of its directives as mandatory. Moreover, the letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal

funding by the Department or refer the case to the U.S. Department of Justice for litigation."

41.     The overriding purpose of the April 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the Brandeis court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished."

42.     The April 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted.

43.     After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual assaults, to adopt procedures that do not safeguard the rights of the accused, and to start with the presumption that a complainant is telling the truth.

44.     In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the April 2011 Dear Colleague Letter, including

the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." In addition, OCR advised schools to give employees and students "trauma-informed" training and said, "hearings should be conducted in a manner that does not inflict additional trauma on the complainant."

45.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence."

46.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding.

47.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

48.   The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs.

49.   Ultimately, the Justice Department funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." End Violence Against Women International, Effective Report Writing: Using the Language of Non-consensual Sex, at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43;   see also Campus Action Kit, Start by Believing, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

50.   Among other things, "Start by Believing" training direct investigators to "recreate the entire reality of the sexual assault from the perspective of the victim."

51.   "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'"

52.    The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.  Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

53.    In February 2014, then Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." Assistant Secretary Lhamon told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them;" that school officials and she as "chief enforcer" needed to "radically change that message;" and that "if you don't want to do it together, I will do it to you."  "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

54.    In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding

inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the April 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

55.    In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the

last step. . . . It means that so far the process has been working." Meredith Clark,

"Official to colleges: Fix sexual assault or lose funding," July 15, 2014, available at:

http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832.

56.    Then Assistant Secretary Lhamon was quoted in the Los Angeles Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," Los Angeles Times, August 17, 2015.

57.    To support effectively making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement.  The sharp increase in the number of investigations was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.  The Federal Government investigated over 250 schools for possible Title IX violations, including notable schools.  According to the Chronicle of Higher Education, that number eventually grew to over 500.  The overwhelming majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students. Indeed, in 2016, OCR for the first time found Title IX violations in response to a complaint by a disciplined student.

58.     Colleges and universities, including UMass Amherst, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

59.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

60.     The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

61.     Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

62.     In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as UMass Amherst, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

**D.**   **The Department of Education Modifies Its Approach to Title**
**IX Enforcement, Focusing on Fairness to All Parties.**

64.   In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings.

65.   Recognizing the harmful results of the April 2011 Dear Colleague Letter, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many."   On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying   due   process   in   a   manner   that   is   wholly   un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.  Included in Secretary DeVos's speech was the following:

> Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.
> . . . .
>
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is   wholly   un-American,   and   it   is   anathema   to   the   system   of   self-

governance to which our Founders pledged their lives over 240 years ago.
. . . .

Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

66.     Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

67.     Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

68.     A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred…;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or

against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

69.     Despite a different direction announced by the current White House Administration, colleges and universities have mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter resulting in gender biased enforcement of Title IX.  UMass Amherst is one such university.

70.     On May 6, 2020, U.S. Secretary of Education Betsy DeVos announced new Title IX regulations.  The U.S. Department of Education written announcement stated:

> The Final Rule requires schools to investigate and adjudicate formal complaints of sexual harassment using a grievance process that incorporates due process principles, treats all parties fairly, and reaches reliable responsibility determinations. A school's grievance process must:

· Give both parties written notice of the allegations, an equal opportunity to select an advisor of the party's choice (who may be, but does not need to be, an attorney), and an equal opportunity to submit and review evidence throughout the investigation;

· Use trained Title IX personnel to objectively evaluate all relevant evidence without prejudgment of the facts at issue and free from conflicts of interest or bias for or against either party;

· Protect parties' privacy by requiring a party's written consent before using the party's medical, psychological, or similar treatment records during a grievance process;

· Obtain the parties' voluntary, written consent before using any kind of "informal resolution" process, such as mediation or restorative justice, and not use an informal process where an employee allegedly sexually harassed a student;

· Apply a presumption that the respondent is not responsible during the grievance process (often called a "presumption of innocence"), so that the school bears the burden of proof and the standard of evidence is applied correctly;

· Use either the preponderance of the evidence standard or the clear and convincing evidence standard (and use the same standard for formal complaints against students as for formal complaints against employees);

· Ensure the decision-maker is not the same person as the investigator or the Title IX Coordinator (i.e., no "single investigator models");

· For postsecondary institutions, hold a live hearing and allow cross-examination by party advisors (never by the parties personally); K-12 schools do not need to hold a hearing, but parties may submit written questions for the other parties and witnesses to answer;

· Protect all complainants from inappropriately being asked about prior sexual history ("rape shield" protections);

· Send both parties a written determination regarding responsibility explaining how and why the decision-maker reached conclusions;

· Effectively implement remedies for a complainant if a respondent is found responsible for sexual harassment;

· Offer both parties an equal opportunity to appeal;

· Protect any individual, including complainants, respondents, and witnesses, from retaliation for reporting sexual harassment or participating (or refusing to participate) in any Title IX grievance process;

· Make all materials used to train Title IX personnel publicly available on the school's website or, if the school does not maintain a website, make these materials available upon request for inspection by members of the public; and

· Document and keep records of all sexual harassment reports and investigations.

71.    The new Title IX regulations requires, among other things, a grievance procedure that includes a live hearing at which the decision-maker must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those questions challenging credibility.  Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally.  Before a complainant, respondent, or witness answers a cross-examination or other question, the decision-maker must first determine whether the question is relevant and explain any decision to exclude a question as not relevant.

72.     On July 17, 2020, Defendant William D. Brady sent the following e-mail to the UMass Amherst campus community:

On May 6, 2020, the U.S Department of Education Office of Civil Rights released updated federal regulations on how colleges and universities must respond to reports of sexual harassment under Title IX, a federal statute that prohibits discrimination on the basis of sex in federally funded education programs or activities. The new regulations require that all education institutions come into compliance by August 14, 2020.

The university is presently reviewing the regulations and, in consultation with the Office of General Counsel and the other campuses in the University of Massachusetts system, will be working diligently to consider their implication. We will keep the UMass community informed as interim policy and procedure revisions are implemented to meet the August deadline. For now, the *University of Massachusetts Amherst Policy against Discrimination, Harassment, and Related Interpersonal Violence* remains in place.

We understand that these long-anticipated changes to Title IX have led to uncertainty and concern for how sexual harassment, sexual assault, and other forms of sexual violence will be addressed on campus. To be clear, UMass Amherst is committed to providing an inclusive and welcoming educational and working environment that is free from all forms of sexual harassment. Though there may be changes to how Title IX offenses are defined, our steadfast commitment to support victims is unchanged. As we work to implement the updated federal regulations, we will continue to address problematic behavior in a timely manner. All necessary adjustments to our policy will be made with thoughtfulness and care.

More information about Title IX at UMass Amherst is available online, including what to do next if you experience gender discrimination, sexual harassment, or other sexual misconduct. Campus support offices continue to work tirelessly on behalf of the UMass Amherst community, and we encourage you to reach out to them for information or support.

**E.**     **John Doe's Disciplinary Case.**

73.     On or about October 20, 2018, John Doe was in his Knowlton dorm room with friends. John Doe was then a freshman at UMass Amherst. Complainant Jane Doe, who was also a freshman at UMass Amherst and whose dorm room was in a different building, messaged John Doe on Snapchat that she wanted to come over to John Doe's room in the Knowlton dorm to hook up, and in the company of a female friend who knew Complainant Jane Doe was going to John Doe's room to hook up, Complainant Jane Doe did in fact go to John Doe's room, John Doe let her in his room, and they proceeded to hook up and have sexual intercourse. It was not the first time that Complainant Jane Doe had gone to John Doe's room to have sexual intercourse. She had been there three or four times previously and had engaged in sexual intercourse and then stayed the night with John Doe. This time, however, when Complainant Jane Doe asked to stay overnight, John Doe said no because his parents were coming in the morning. Complainant Jane Doe left and texted another of her friends who lived on the same floor as John Doe's room and then walked back to her dorm building with another friend.

74.     A few days later, on or about October 22, 2018, Complainant Jane Doe went to and knocked on John Doe's dorm room door, and when John Doe opened the door, she shouted accusations at him. Complainant Jane Doe had been drinking on October 20, 2020, and did not remember what happened; she, however, assumed

she had sexual intercourse with John Doe, which formed the basis for her accusations.  John Doe yelled back that he hadn't raped her.  A dorm Resident Assistant heard John Doe.  But nothing further came of the incident for over a year.

75.     Over a year after the alleged incident, on November 3, 2019, when John Doe was a sophomore at UMass Amherst, Complainant Jane Doe went to the university to change her university housing to be in the Knowlton dorm and to have John Doe moved elsewhere.  Complainant Jane Doe was told she needed to file a sexual misconduct complaint against John Doe in order to have John Doe moved.  As a result, Complainant Jane Doe filed her university complaint against John Doe for sexual misconduct.  John Doe was not informed, however, until January 2020 because Jonathan Connary, Assistant Dean of Students for Student Conduct, decided not to interrupt John Doe's studies for the Fall semester.

76.     On January 7, 2020, Jonathan Connary, Assistant Dean of Students for Student Conduct, sent an e-mail to John Doe saying that John Doe's cell phone message box was full and that he (Associate Dean Connary) had "some information" that he needed to review with John Doe.

77.     Also on January 7, 2020, John Doe received an e-mailed letter of that date from Patricia Cardoso-Erase, the Associate Dean of Students for Student Conduct and Compliance at UMass Amherst, informing John Doe that he was the subject of a sexual misconduct disciplinary proceeding.  The letter stated that the

incident occurred at 1:00 AM on October 20, 2018, at the Knowlton dorm, when John Doe engaged in non-consensual sexual acts with complainant Jane Doe in violation of the UMass Amherst Student Code provisions prohibiting sexual misconduct and sexual harassment. John Doe was also warned that the possible sanctions included suspension and expulsion, given a no contact order with the complainant Jane Doe and informed that the next step in the process was to have an administrative meeting when he could give his side of the story.

78.     On January 23, 2020, John Doe met with Assistant Dean Connary about the alleged incident in October 2018, and at that time, John Doe was reassured that nothing would come of the Complainant Jane Doe's university complaint against John Doe.

79.     Also, on January 23, 2020, John Doe received an e-mail confirming that John Doe's Conduct Case Records Request was submitted to the UMass Amherst Student Conduct and Community Standards Office.

80.  On March 6, 2020, Assistant Dean Connery e-mailed John Doe that he (Assistant Dean Connary) had met with some witnesses and that he wished to arrange another meeting with John Doe.  John Doe called to set up that second meeting, but no such meeting was ever scheduled by Assistant Dean Connery.

81.     On March 10, 2020, Assistant Dean Jonathan Connary sent an e-mail to John Doe saying that John Doe's case has been referred to a University Hearing

Board, which would consist of a panel of three to five faculty, staff and/or students and which would determine whether there was a violation of the UMass Amherst Student Code and that a staff member from the Student Conduct and Community Standards Office would be on contact with John Doe about the scheduling of the hearing.

82.   On March 12, 2020, John Doe was e-mailed by the Dean of Students Office that his Student Conduct History Report was available for John Doe's review. This was not, however, the investigation file in the disciplinary case triggered by Complainant Jane Doe's complaint.

83.   On April 22, 2020, two days before the scheduled hearing, John Doe received an e-mail from Corrina Marchand, Conduct and Compliance Manager in the Student Conduct and Community Standards Office, informing John Doe that the hearing in his disciplinary case would be held on April 24, 2020, which was in two days, and that a pre-hearing meeting could be held on April 23, 2020. John Doe was not informed who would be the members of the hearing panel and thus had no way of checking to see if there were any conflicts of interest.

84.   On April 23, 2020, Corrina Marchand, Conduct and Compliance Manager in the Student Conduct and Community Standards Office, confirmed with John Doe that the investigation file was available for John Doe's review that day

and informed him that John Doe would be given one hour access to the investigation file and that John Doe was not allowed to make any copies of the file's contents.

85.     In the afternoon of April 23, 2020, John Doe reviewed the investigation file for one hour, doing the best he could to understand the information in the file, which consisted of fifty pages of single-spaced information.  Only at this pre-hearing meeting was John Doe advised by anyone at UMass Amherst that at the hearing, he could have an advisor with him, but at that point, it was as a practical matter too late to retain an advisor.  John Doe was not advised that he could request an adjournment so that he could retain an advisor.  John Doe was not advised that he could make an opening statement. John Doe was not provided with instructions on how and when to submit a final written argument to present to the hearing panel and was not instructed on preparing statements for the hearing, such as opening, closing and impact statements.

86.     On April 24, 2020, the "hearing" was held by Zoom conference.  No transcript or recording was made of the "hearing."   Neither John Doe nor Complainant Jane Doe were asked any questions by the hearing panel.   The questions posed by the hearing panel were to two non-party witnesses asking how drunk Complainant Jane Doe was and what were Complainant Jane Doe's intentions in going to John Doe's room the night in question.  Assistant Dean Connary told the hearing panel that John Doe was not informed until January 2020 about Complainant

Jane Doe's complaint in November 2019 because he (Assistant Dean Connary) decided not to interrupt John Doe's studies for the Fall semester and that he (Assistant Dean Connary) informed John Doe thereafter.  Complainant Jane Doe did not provide any medical or physical evidence to back up her claim of non-consensual sex.  Complainant Jane Doe had not filed any report with the police ever and did not with the university for over a year.  Complainant Jane Doe nevertheless claimed the October 20, 2018 incident ruined her life, which was not true; Complainant Jane Doe's boyfriend had broken up with her in the Spring 2020 and she had left school then.

87.     On May 22, 2020, John Doe received the "outcome letter" from Associate Dean of Students for Student Conduct and Compliance Patricia Cardoso-Erase.  John Doe was found responsible for sexual misconduct in violation of the UMass Amherst Student Code.  The outcome letter only stated that conclusion and did not state any findings of fact or provide any explanation in support.  John Doe was sanctioned as follows: (1) immediate two-year suspension through May 31, 2022; (2) restriction from entering or residing in all University-approved housing; (3) re-entry assessment meeting to determine whether or not the University will support the readmission application; (4) counseling with a licensed, off-campus health professional; (5) no contact directive with the complainant Jane Doe through May 31, 2025; and (6) follow-up meeting with a Student Conduct and Community

Standards Office staff member during the first semester reenrolled at the university. The "outcome letter" concluded that John Doe had a right to appeal the decision based on procedural error affecting the outcome of the case or new information and that John Doe had five days to file such as appeal.

88.     John Doe timely filed with the university an appeal of the sanction, citing numerous procedural errors, including the following:

(a)     One cited error was that UMass Amherst brought a proceeding based on an untimely complaint.  The UMass Amherst Student Code provided that "a complaint alleging student misconduct must be filed no later than one year after discovery of the alleged violation and the identity of the student(s) involved by the victim."  UMass Amherst failed to follow its own policy by accepting a complaint on November 3, 2019 for an alleged incident that had occurred more than year prior on October 20, 2018.

(b)     A second cited error was that the burden of proof was effectively placed upon John Doe to prove his innocence, rather than UMass Amherst and Complainant Jane Doe having the burden of proof to show that sexual misconduct had occurred.

(c)     A third cited error was that UMass Amherst procedures afforded many supportive measures for female complainants who are treated preferentially under the procedures, but there was no statement in the procedures about providing

male respondent with "referral to resource offices." UMass Amherst offered referral information for a Civilian Advocate only for "victims/survivors" and offered arrangements to meet with the advocate at locations "including University Offices." UMass Amherst's list of "My Title IX Rights" was "adapted from the Coalition to End Rape Culture Survivor Bill of Rights," which specified no rights for the accused. The list of services in the January 7, 2020 charging letter received by John Doe included the "Center for Women and Community" but no indication of what services they provided to male respondents.

(d)     A fourth cited error was that John Doe was prejudiced by the delay with respect to Complainant Jane Doe's complaint, which was filed November 3, 2019 but about which John Doe was not told until January 7, 2020 concerning an alleged incident occurring October 20, 2018. John Doe asserted that he was not provided "with an equal opportunity to prepare a defense, speak with witnesses or to gather and preserve evidence such as the Complainant [Jane Doe] had for more than one year."

(e)     A fifth cited error was that John Doe was prejudiced by the failure to follow procedure as to the investigation. UMass Amherst procedures state that the "interviews (in order) Complainant, Respondent, and witnesses"; however, John Doe was not provided with the witnesses' statements for a second interview in order to respond to any information in those statements.

(f)     A sixth cited error was that John Doe was prejudiced by the failure of UMass Amherst to identify any of the members of the hearing board until the "hearing" started, which did not give John Doe the opportunity to determine if there was a conflict of interest and to request an alternate if necessary.

(g)     A seventh cited error was that John Doe was only informed that he could have an adviser present at the "hearing" the afternoon before the "hearing," which was insufficient time for John Doe to retain a person to act as his adviser.

(h)     An eighth cited error was that John Doe was prejudiced by not being provided with instructions on how and when to submit a final written argument to present to the hearing panel and was not instructed on preparing statements for the hearing, such as opening, closing and impact statements.

(i)     A ninth cited error was that John Doe was prejudiced by not being given access to the hearing documents until one day before the "hearing" and was only allowed to review the documents for one hour without making copies of any file documents.  The file consisted of fifty pages of single-spaced interviews and evidence, and given the duress that John Doe was under, it was practically impossible to analyze and copy important information to present to the hearing board.

89.     John Doe's appeal was denied.  This lawsuit has therefore been brought to rectify the constitutional due process violations and Title IX discriminatory actions.

## FIRST CAUSE OF ACTION
## (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)

90. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

91. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

92. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

93. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process. Deprivation of the protected liberty interest, identified by the "stigma-plus" test, occurs where, as here, the State inflicted reputational damage accompanied by an alteration in legal status that deprived the person of aright he previously held. John

Doe satisfies this test because Defendants inflicted reputational harm by wrongfully branding him as a sex offender and Defendants changed John Doe's legal status by suspending him, subjecting him to readmission requirements to a State school.

94. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

95. John Doe's constitutionally protected property interest in his continued enrollment at UMass Amherst and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by UMass Amherst. John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between UMass Amherst and John Doe. UMass Amherst created a contract when John Doe accepted an offer of admission to UMass Amherst and paid the tuition and fees.  A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study.

96. UMass Amherst Policies did not provide a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed. UMass Amherst deprived John Doe of his federally protected property interest in the UMass Amherst contract with John

Doe when it failed to conduct a fair and impartial process, including not giving meaningful access to John Doe to the investigation file and not holding a real hearing before an impartial and objective decision-maker. Instead, John Doe was subjected to hearing by ambush without the assistance of an advisor.

97.   Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth and has been ruled to be required for basic due process in campus disciplinary cases. Yet, in a case where UMass Amherst relied upon a credibility assessment, there was no hearing and thus no cross-examination was permitted and no sworn testimony was taken in violation of due process of law.

98.   UMass Amherst failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of Jane Doe's allegations and subsequent adjudication in a manner that was biased against John Doe. Further, John Doe was severely prejudiced in being able to defend himself because he was denied access to the investigation file until one day before the "hearing" and even then was only allowed one hour of access without being able to make copies of the file's contents.

99.   UMass Amherst improperly placed the burden of proof on John Doe to prove that Jane Doe's accusations were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching its outcome.

100. If John Doe as a UMass Amherst student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that UMass Amherst used.

101. UMass Amherst, as a land grant university established by the State of Massachusetts, and the individual Defendants, as agents of UMass Amherst, have a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

102. John Doe had obeyed all institutional rules when he was wrongly suspended from UMass Amherst.

103. John Doe had a constitutionally protected property interest in continuing his education at UMass Amherst and thus was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for John Doe.

104. Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be informed of the evidence against him, his right to be innocent until shown to be responsible and not to be subjected to the

burden of proving innocence, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

105. Defendants, as well as other agents, representatives, and employees of UMass Amherst, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for John Doe's constitutional rights.

106. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

107. As a result of these due process violations, John Doe continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, suspension from UMass Amherst denied him the benefits of education at his chosen school and also damaged John Doe's academic and professional reputation.

108. Kumble R. Subbaaswamy as the Chancellor of UMass Amherst is ultimately responsible for the university's compliance with a federal court injunction for  performance and operations as an educational institution of higher learning, which includes compliance with federal and state laws and court decrees specific to UMass Amherst, including any expungement of a disciplinary record.

109. William D. Brady as the Vice Chancellor  as Chief Human Resources Officer & Interim Title IX Coordinator at UMass Amherst is responsible in his

official capacity for the overall operation of the disciplinary investigation and adjudication process at UMass Amherst, and thus would be tasked to have UMass Amherst comply with any federal court injunction concerning ongoing due process violations in a disciplinary case, including any expungement of a disciplinary record.

110. Patricia Cardoso-Erase as the Associate Dean of Students for Student Conduct and Compliance at UMass Amherst is responsible in her official capacity for the conduct of disciplinary investigations and meetings with the disciplinary respondents and is responsible in her official capacity for making the decision in a disciplinary case.

111. The constitutional due process violations here in John Doe's disciplinary case occurred because Kumble R. Subbaaswamy, William D. Brady and Patricia Cardoso-Erase, when engaged in constitutional due process violations, effectively acted outside their respective authority. For a federal court injunction ordering prospective relief in a case involving a sexual misconduct disciplinary proceeding at UMass Amherst, joinder of Kumble R. Subbaaswamy, William D. Brady and Patricia Cardoso-Erase in their respective official capacities is necessary so that the injunction is enforced.

112. As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decision, granting expungement of John Doe's transcript of the disciplinary record, ordering the ending

of the suspension subject to any readmission requirements and enjoining future violations of due process in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action.

113.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, military career opportunities, economic injuries and other direct and consequential damages. John Doe's interests in the results of the disciplinary process are significant.

114. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints.

### SECOND CAUSE OF ACTION:
### (Erroneous Outcome, Selective Enforcement and Violation of Title IX of the Education Amendments of 1972)

115.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

116.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance.

117.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little  direct federal funding of school sports.

118.   UMass Amherst has received and continues to receive nearly $90 million or more in annual federal funding.

119.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. of Education*, 526 U.S. 629 (1999), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline, *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  In either case, the statute is enforceable through an implied private right of action.

120. Challenges to university disciplinary proceedings for sex discrimination generally fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate

the proceeding was affected by the student's gender.  *Yusuf v. Vassar College*, 35
F.3d 709, 715 (2d Cir. 1994).

121.   An "erroneous outcome" occurred in this case because John Doe was
innocent and wrongly found responsible for non-consensual sexual behavior and the
totality of the circumstances establish gender bias was a motivating factor.
"Selective enforcement" occurred in this case because John Doe was subject to a
two-year suspension without sufficient justification given that both John Doe and
Jane Doe were intoxicated on the night in question, yet it was John Doe who was
found responsible for sexual misconduct; this "unduly severe penalty" was affected
by John Doe's male gender.

122.   Gender bias was a motivating factor behind the two-year suspension
imposed upon John Doe based on the allegations of the female Complainant Jane
Doe concerning an alleged incident in October 2018 about which Complainant Jane
Doe did not complain with the police ever and did not complain with the university
for over a year.  Gender bias is implicit in the cavalier treatment of John Doe in terms
of not providing him meaningful access to the investigation report and not timely
advising him about having an advisor.  Gender bias is implicit in the imposition of a
two-year suspension based on the female's allegations that were treated as
presumptively true -- despite the lack of a timely complaint, despite the lack of
medical and physoical evidence.  UMass Amherst has maintained a female victim

oriented disciplinary process for sexual misconduct that has been anti-male in operation because almost all complainants are female and almost all respondents are male and because UMass Amherst has provided ample resources to female complainants but none to male respondents.

123.   As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decisions, expungement of John Doe's transcript of the disciplinary record, and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe.

124.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages.

125.   As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decisions, expungement of John Doe's transcript of the disciplinary record, and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment as follows:

(i)    on the first cause of action for denial of constitutional due process in violation of 42 U.S.C. § 1983, a judgment awarding John Doe an injunction against the individual Defendants vacating John Doe's disciplinary findings and decision, expungement of John Doe's transcript of the disciplinary record, and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe; and

(ii)    on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against UMass Amherst awarding John Doe:

(a)    an injunction against UMass Amherst vacating John Doe's disciplinary findings and decision, an injunction vacating John Doe's disciplinary findings and decisions, expungement of John Doe's transcript of the disciplinary record, and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe;

(b)    damages against UMass Amherst in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future

career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(iii)    awarding John Doe such other and further relief as the Court

deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that

are triable by a jury.

**Dated: New York, New York**
     **August 21, 2020**                  **Respectfully submitted,**
                                          **NESENOFF & MILTENBERG, LLP**

                                          **By: /s/Tara Davis**
                                          **Tara Davis, Esq.**
                                          **101 Federal Street, 19th Floor**
                                          **Boston, MA 02110**
                                          **(617) 209-2188**
                                          **tdavis@nmllplaw.com**

                                          **Philip A. Byler, Esq.**
                                          **Andrew T. Miltenberg, Esq.**
                                          **363 Seventh Avenue, Fifth Floor**
                                          **New York, New York 10001**
                                          **(212) 736-4500**
                                          **amiltenberg@nmllplaw.com**
                                          **pbyler@nmllplaw.com**
                                          **Attorneys for Plaintiff John Doe**